NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar Number 13644
NADIA AHMED
Assistant United States Attorney
501 Las Vegas Blvd. South, Ste. 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336 / Fax: (702) 388-5087
nadia.ahmed@usdoj.gov

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-oOo-**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>STEVEN A. HOLPER,<br><br>    Defendant. | Case No.   2:18-CR-00037-JAD-NJK<br><br>**GOVERNMENT'S AMENDED RESPONSE TO DEFEENDANT'S SENTENCING MEMORANDUM (ECF NO. 59)** |

Certification: This memorandum is timely.[1]

    The United States, by and through undersigned counsel, hereby submits this Response to Defendant's Sentencing Memorandum. The defendant, Steven Holper, was a physician trusted and relied upon by this community for almost thirty years to treat, heal and protect their physical health. Dr. Holper betrayed that trust, prescribing some of the most powerful and addictive pain medications to his patients outside the course of his professional practice and without legitimate medical purpose. In doing so he, he risked his patients' lives and contributed to at least one of his patients' deaths. For these reasons, and as discussed further

---

[1] This amended response to defendant's sentencing memorandum is submitted the same day the original response was filed.

1

herein, the Court should decline to grant the defendant probation and should sentence him to 71 months' imprisonment - a sentence sufficient but not greater than necessary to comply with the objectives articulated in 18 U.S.C. § 3553(a).

### I.     Factual Background

The defendant, Steven Holper ("defendant" or "Holper"), was a licensed physician practicing medicine in Nevada since 1990. Holper conducted his pain management practice at his clinic located on West Charleston Blvd near the UMC hospital area. Holper obtained a Drug Enforcement Administration (DEA) license, number BH2498106, through which he was authorized to prescribe controlled substances. Pursuant to the Controlled Substances Act (CSA) and related regulations, as a physician Holper was required to comply with standard practices of care, which dictate that physicians collect patient vitals, symptoms, examine patients and make appropriate notations of examination prior to prescribing a controlled substance as part of the course of treatment. Moreover, the CSA requires that a prescription for a controlled substance is neither legal nor effective unless it is issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.

Fentanyl is a Scheduled II controlled substance – meaning it has a high potential for abuse which may lead to severe psychological or physical dependence.[2] It is a powerful synthetic opioid painkiller that is 100 times more potent than morphine and 40 to 60 times more potent than 100% pure heroin. When legally prescribed for a legitimate medical purpose, it is used for the management of breakthrough cancer pain in cancer patients who are already receiving opioid medication for their underlying persistent pain. Fentanyl is available in various forms, including Subsys, which is a sublingual spray of fentanyl manufactured by INSYS

---

[2] www.deadiversion.usdoj.gov/schedules/

Therapeutics. Subsys is a Schedule II Controlled Substances.

As a doctor prescribing Subsys to his patients for breakthrough pain, Holper was required to enroll in the Transmucosal Immediate Release Fentanyl (TIRF) Risk Evaluation and Mitigation Strategy (REMS) program, an FDA-required program designed to ensure informed risk-benefit decisions before initiating treatment, and while patients are treated to ensure appropriate use of TIRF medicines. Per the TIRF REMS website, the purpose of the TIRF REMS Access program is to mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors with the use of TIRF medicines.[3] Before prescribing TIRF drugs to a patient, the prescriber must fill out and sign a REMS form that explicitly state, "I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain."

Holper was required to instruct his patients and their caregivers that TIRF medicines contain medicine which in any amount can be fatal to children, individuals for whom it is not prescribed, and to those who are not opioid-tolerant and advise patients to dispose of used unit dose systems immediately after use, and any unneeded unit dose systems remaining from a prescription, as soon as they are no longer needed.

Holper approved Patient A's enrollment into the TIRF REMS Access Program, fraudulently stating that Patient A had been prescribed other Schedule II prescriptions without success. Holper prescribed Subsys to Patient A, who did not have cancer, in violation of the TIRF REMS Access Program guidelines. From September 2014 to March 2016, Holper prescribed Subsys to Patient A outside the usual course of professional practice and without a

---

[3] https://www.tirfremsaccess.com/TirfUI/rems/home.action

3

legitimate medical purpose, then illegally distributed fentanyl in the form of Subsys to Patient A.

      Holper last prescribed Subsys 600 mg spray 60 on or about June 8, 2015 to Patient A. However, between July 2015 and March 2016, after Holper stopped prescribing Subsys to Patient A, he regularly provided Patient A Subsys canister sprays without a prescription. Patient A used a small tool to open the canisters to access the remaining fentanyl. Patient A then used a syringe to inject the fentanyl into Patient A's arm.

      On March 12, 2016, Patient A retrieved used Subsys canisters from Holper's residence in the late morning. Later that day, Patient A died. Patient A's death was ruled accidental and a condition relating to Patient A's cause of death was classified as Fentanyl intoxication. Hundreds of canisters of Subsys spray were found in and around Patient A's bedroom, bathroom, work place, and vehicle.

      In addition to Patient A, Holper prescribed Subsys to patients B-V, confirming that they were breakthrough cancer pain opioid tolerant and eligible patients, when the patients did not have cancer. In doing so, Holper violated the TIRF REMS regulations, which resulted in health insurance providers continuing to pay for Subsys prescriptions.

      On December 10, 2018, Holper entered into a plea agreement pleading guilty to Count 2, which charged him with an illegal distribution to Patient A on or about September 12, 2015. In the written plea agreement, Holper further admitted that between July 2015 and March 2016, Holper "prescribed and distributed dosages and amounts of Fentanyl, Oxycodone and Hydrocodone, to his **patients** outside the usual course of his professional practice and without a legitimate medical purpose. Defendant did so with the intent to prescribe Fentanyl, Oxycodone and Hydrocodone outside the course of his professional practice and without a legitimate

medical purpose."[4] (Emphasis added.)

II.     **Sentencing Guidelines Calculation**

   A.  **Applicable Law**

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and, (6) not presume that the Guidelines range is reasonable. *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008). When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994. The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

   B.  **Calculation of the Guideline Range**

The plea agreement based its guideline calculations as to the converted drug weight specifically relating to Count 2 at 410 kg based on distributions of fentanyl, oxycodone and hydrocodone. In considering relevant conduct, the PSR extrapolated the distribution to Patient

---

[4] ECF 50, p. 5:6-12.

A to Patients B through V (patients named in other counts in the indictment). The PSR determined that the total relevant converted drug weight was thus 8,610 kg. Accordingly, the PSR determined that the Base Offense level was 32 (USSG §§ 2D1.1(a)(5)(c)(4), a 2-level enhancement for his position of public/private trust (USSG § 3B1.3), and a 3-level reduction for acceptance of responsibility (USSG § 3E1.1) for a total adjusted offense level of 31.

The parties contemplated to Guideline range predicated on the single prescription in Count 2 and stipulated to a total converted drug weight of 410 kg, resulting in a Guideline calculation of 25. This results in a Guideline range of 57-71 months. Given the relevant conduct referenced in the PSR, the other patients and other prescriptions to Patient A, a sentence at the high end of the Guideline range – 71 months – is appropriate.

### III.   Application of 18 U.S.C. § 3553(a)

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a sentence that is "sufficient, but not greater than necessary." Those objectives are: (i) the nature and circumstances of the offense, and the history and characteristics of the defendant; (ii) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (iii) the kinds of sentences legally available; (iv) the Sentencing Guidelines; (v) Sentencing Commission policy statements; (vi) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (vii) the need for restitution.

   A.   Nature and Circumstances of the Offense, and the History and Characteristics of the Offender, 18 U.S.C. § 3553(a)(1)

Drug trafficking savages individuals, families, friends and the community as a whole. *United States v. Stone*, 608 F.3d 939, 947, n. 6 (6th Cir. 2010) ("To be sure, drug trafficking is a

serious offense that, in itself, poses a danger to the community."); *United States v. Leon*, 766 F.2d 77, 81 (2nd Cir. 1985) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'"). In 2016, there were 408 opioid-related deaths in Nevada, according to the Nevada Department of Health and Human Services. In 2016, Nevada's per capita prescription rate for opioids was 87/100 residents. Nevada ranked as the sixth highest state for the number of milligrams of opioids distributed per adult according to a DEA study. From 2010 to 2016, opioid-related hospitalizations have increased by 136% in emergency room encounters and 84% in in-patient admissions. During this time period, 85% of all opioid-related deaths in Nevada were deemed accidents. (National Institute on Drug Abuse Study for Nevada, February 2018)

In the instant case, Holper aided in the dangerous and illegal trafficking of prescription opioids, disregarding his obligations as a physician and the rigorous requirements imposed by the FDA with respect to prescribing Subsys under the TIRF REMS program. He engaged in this illegal endeavor knowingly and willingly. The defendant understood the potential consequences of his actions and made a conscious choice to accept those risks. Holper argues that he was not motivated by profit but rather by the desire to limit his patients' pain. But the frank reality is that Holper failed to comply with the very program designed to ensure patients with brea through pain would be able to access needed but powerful medication in a safe and effective way. Holper's patient files did not reflect adequate care, reasoning, examinations. Holper may claim now, and since he was first indicted, that he was motivated by his and his patients' pain but the truth is Holper did benefit financially from his criminal conduct. He billed Medicare and obtained financial benefits in exchange.

Similarly, Holper's claims that he was just another dupe at the hands of the Insys falls flat. While it may be true that Insys was motivated to maximize its profit, sought to have

doctors prescribe Subsys and came to Holper because he was both a Subsys user and prescriber, these facts in no way excuse Holper's own, admitted conduct that *he* made the knowing and purposeful decision to prescribe opioids outside the usual scope of his professional practice and without medical necessity. Holper continued to give Patient A subsys even after claiming to cut Patient A off as a patient. Moreover, Holper, in becoming a member of the TIRF REMS program understood better than anyone the risks associated with Subsys but he cavalierly continued to prescribe it inconsistent with the program's guidelines.

And perhaps the most significant aspect of this case, of course, is the Fentanyl related death by Patient A. Holper insists that there was no evidence that the used containers of Subsys were what Patient A utilized the day of Patient A's death. But Holper glosses over evidence that Holper continued to supply Patient A with Subsys after he claimed to have terminated their doctor-patient relationship.

Holper had been a doctor in the community for decades prior to these events. He was respected and relied upon by his patients. He made a comfortable income treating them. Yet, Holper knowingly, intentionally and purposefully prescribed powerful, highly addictive opioids to his patients without adequate examination, justification or medical necessity. In doing so Holper cavalierly risked their lives. And ultimately Patient A's life was lost.

Holper's conduct in this case in light of the many opportunities he was given along the way throughout his life to lead a successful business and practice medicine in a safe and honest way warrants a serious penalty. He was placed in a position of trust. He abused that position. He did it for his own benefit as much as he may have done it to help any of these patients with their pain. Holper claims he was helping Patient A with a craft project that bizarrely involved the use of empty Subsys containers – an individual he had terminated his professional relationship with because of addiction concerns! – but the evidence before this Court is that

Patient A, who was a parent of a school going child, died surrounded by hundreds of empty Subsys containers.

But Holper's criminal conduct did not just stop with Patient A. It went on to Patients B through V. And aside from them, it included patients listed in the medical expert's reports. The widespread ramifications of his conduct are impossible to measure and quantify but there can be little doubt that collectively his conduct warrants a serious sentence at the high end of the Guideline range.

Holper also claims that his own third party dependents – specifically his three year old daughter – will suffer should he be incarcerated, suggesting he intends to seek custody of his daughter, and actively care for her. Yet Holper also paints a picture for the Court of himself as an individual who is almost completely debilitated by his own physical ailments through which his mental health has been impacted. Holper's health issues undermine the suggestion that he would primarily care for his daughter. Holper also has a 12-year-old child from a prior relationship, for whom he is required to provide child support. However, his son's mother indicated Holper fails to make payments and has almost no relationship with his son. The information in the PSR and Holper's own brief thus undercut the suggestion that Holper could or would provide care and support for his young children or that his children should sway the Court away from imposing a custodial sentence.

**B. Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment, 18 U.S.C. § 3553(a)(2)(A)**

A 71 month custodial sentence appropriately accounts for the seriousness of Holper's offense and justly punishes it. *See* 18 U.S.C. § 3553(a) (2)(A). Holper's distribution of illegal prescription drugs presented a serious danger that should not be trivialized. Opioid abuse is on the rise and tearing apart communities, especially here in the Las Vegas Valley. According to

the Center for Disease Control (CDC), more than 42,000 people died from a prescription opioid overdose in 2016 and over 1,000 people are treated in the emergency room daily for improper use of prescription opioids. (CDC October 2017.)  For a health care professional of Holper's experience and standing to contribute to this epidemic is serious and warrants punishment.

In order for the Court to provide just punishment, a significant custodial sentence is necessary.  Holper, despite being a licensed medical provider, in some respects was acting as little more than a drug dealer in a white coat.  His status as a well-educated, white-collar offender does not warrant any leniency given the circumstances of this case.

While some may argue that the opioid epidemic is a public health issue, it cannot be that alone.  There must be a criminal justice approach to stop the source of dangerously addictive opioids from hitting the streets and addicting our communities.  As a doctor, Holper had the choice of placing these drugs in the hands of sick and susceptible individuals. A custodial sentence of 71 months in this instance is what justice requires.  It would reflect the seriousness of this offense, justly punish Holper's criminal actions and promote respect for the law.

**C.     To Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(B)-(C)**

A 71 month custodial sentence would certainly provide both specific and general deterrence for Holper's criminal conduct.  *See* 18 U.S.C. § 3553(a)(2)(B).  Deterrence serves to discourage others who are inclined to involve themselves in similar criminal conduct.  It is also an important consideration when fashioning a sentence that will persuade a defendant from continuing to engage in criminal behavior.  Holper argues his age cuts against a custodial sentence providing deterrence to his actions but in reality even now Holper continues to envision a professional life in the medical field – one in which he claims he would teach or do

something else similarly removed from actual practice but the reality is that this profession is all he knows. He is a proclaimed workaholic who has been a doctor in Las Vegas for nearly 30 years. It is hard to believe Holper would find a path away from the medical field should he continue to work. The risk that Holper poses to the public must be mitigated by a sentence of incarceration. While losing his medical license is certainly a measure that checks Holper's ability to prescribe medicine under his own DEA number it does not foreclose his ability to continue to practice in more roundabout ways. And while losing his medical license may be a consequence of his criminal conduct it is not a punishment or sentence imposed by this Court to address his conduct.

      Healthcare professionals, whether they have been in this community for decades or days, must see that engaging in criminal conduct of this magnitude will not be tolerated or treated lightly. Healthcare practitioners willing to take their patients lives in their hands – as Holper did here – must be sent the strongest and sternest message that their criminal conduct is will carry significant consequences. If general deterrence is to serve any aim – it has "value in the process of imposing punishment because it works to keep judges from succumbing to the impulse to see white-collar defendants in the warm light of a contrite individual who engaged in aberrational conduct but is unlikely to offend again."[5]

      The justice system all too often treats white-collar defendants, like Holper, different from their counterparts, street drug dealers.  The street dealers have been designated to have a higher chance at recidivism because their background suggests that they have nothing to lose; as opposed to the doctors that are supplying the drugs. Accomplished physicians, like Holper,

---

[5] Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 32 (2015).

have made conscious choices to act this way and throw away years of education and training. Like others before him, Holper is not the victim here – Insys is not to blame nor is anyone else for Holper's current position.

### D. To Avoid Unwarranted Sentencing Disparities, 18 U.S.C. § 3553(a)(4)

There are differing views on whether the need to avoid unwarranted sentencing disparities should be evaluated on a case specific level or a national/local level. On a national level, courts have sentenced doctors involved in drug diversion conspiracies to substantial custodial sentences. *See e.g. United States v. Dr. Michael Kostenko*, 16-cr-221 (S.D.WV) (240 months for unlawful distribution of Oxycodone); *United States v. Dr. Michael Dietch*, 16-cr-123 (M.D.FL) (135 months for distributing oxycodone); *United States v. Dr. Edward Feldman*, 14-cr-521 (M.D.FL) (300 months for distribution of Oxycodone); *United States v. Dr. Fred Turner and Dr. Rosetta Cannata*, 15-cr-264 (M.D.FL) (both doctors sentenced to 151 months for distribution of Morphine, Hydrocodone and Oxycodone), and *United States v. Capos, Jr.*, 14-cr-20 (E.D.CA) (52 months for distribution of Oxycodone).

Moreover, in this district, medical professionals who have been convicted of unlawfully prescribing controlled substances without a legitimate medical purpose have also received custodial sentences. In 2017, Dr. Robert Rand was sentenced for his distribution of controlled substances to 120 months' incarceration, Case No. 3:16-cr-29-MMD-WGC. Of note in 2016, in the *Unites States v. Dr. Henri Wetselaar*, 11-cr-347 (D.NV) he was sentenced to 120 months for distribution of Oxycodone. Other healthcare practitioners convicted and sentenced on distribution charges include: Alex Incera, an APRN, who was sentenced in June 2019 to 78 months' incarceration for distribution and health care fraud in *United States v. Alejandro Incera*, his co-conspirator, Dr. Guerra in *United States v. Horace P. Guerra*, 2:18-cr-00197 (D.NV), who was sentenced in December 2018 to a 12 month and one day custodial sentence for his very

limited role in Incera's distribution conspiracy, Nelson Mukuna, a pharmacist co-conspirator of Incera's was sentenced to 14 months incarceration in his case. In May 2019, Dr. Devendra Patel was sentenced to 39 months' incarceration for distribution of controlled substancesin Case No. 3:17-cr-114-LRH-CBC.

In September 2015, this Court also sentenced Dr. Paulin to 24 months on Distribution and Structuring charges. In July 2014, Dr. Bruce was sentenced to 46 months on Conspiracy to Distribute charges. In October 2015, Dr. Kuthuru was sentenced 28 months on Distribution charges. In October 2011, Dr. Tindall was sentenced to 24 months on Distribution charges.  In December 2013, Dr. Bararia was sentenced to 44 months on Distribution charges.  All of these defendants were licensed professionals in Nevada that violated their oath to do no harm, betrayed the trust of and injured the community.

In sum, this district has long recognized that when doctors such as Holper betray the trust of the community that they have sworn an oath to protect by distributing controlled substances a sentence of incarceration is warranted. Moreover, the mine run of the cases listed above did not include the aggravating factor of a patient's opioid-related death and yet those doctors were given serious, custodial sentences. Some of the health care practitioners identified above were older than Holper, and faced health care issues, including Wetselar. Some of them were young, at the beginning of their careers, and many have third party dependents. Yet the Court did not hesitate to punish their criminal conduct by imprisoning them and imposing in many of those cases a Guideline sentence.

Here too, for the reasons stated herein, the Court should impose sentence within but at the high end of the Guideline range as to defendant Holper. Such sentence is necessary to achieve the goals outlined in Section 3553 of punishing his criminal conduct, deterring future criminal conduct, protecting the community and avoiding unwarranted sentencing disparities.

### IV. Conclusion

WHEREFORE, the Government respectfully requests that the Court sentence Defendant Holper to **71 months' imprisonment** and a three-year term of supervised release with the special condition prohibiting him from working in any medical setting during the term of supervision.

DATED this 18th day of July, 2019.

Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

 /s/  Nadia Ahmed
NADIA AHMED
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I, Nadia Ahmed, certify that defendant's counsel of record was served with a copy of the **GOVERNMENT'S AMENDED RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM (ECF No. 59)** on this date by electronic case filing.

DATED:   July 18, 2019

                                                                     *Nadia Ahmed*
                                        Assistant United States Attorney